**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| DANA OLITA, *individually and on behalf of all others similarly situated*,<br>Plaintiff,<br><br>vs.<br><br>IVIM SERVICES, LLC,<br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Dana Olita, individually and on behalf of all others similarly situated ("Plaintiff"), brings this class action lawsuit against Ivim Services, LLC ("Ivim" or "Defendant") and alleges, upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This class action lawsuit addresses Defendant's improper, unauthorized, and unlawful collection and disclosure of users' personally identifiable information ("PII") and/or protected health information ("PHI") to third-party advertising platforms and data analytics companies without those users' knowledge or informed consent.

2. The market for glucagon-like peptide-1 (GLP-1) medications has experienced explosive growth in recent years, with approximately 20 million

Americans using drugs like Wegovy, Ozempic, Mounjaro, and Zepbound for weight loss and diabetes management.[1]

3. Defendant is a participant in this market, serving as an online platform for GLP-1 prescription services to patients across the United States.

4. Defendant's operations occur through the website www.ivimhealth.com and its related properties (collectively, the "Website"), which it owns, controls, and maintains. On the Website, Defendant purports to offer "unlimited access to expert practitioners [and] custom care plans" to users.[2]

5. Defendant does not, however, disclose that the Website is a conduit for the capture and transmission of PII and PHI to third party marketers. Through trackers embedded on the Website, and especially in the intake quiz section where users enter their sensitive health information including weight statistics and health conditions, third party marketing companies collect user data including PII and PHI.

6. Medical data like this PHI is among the most valuable commodities in the digital economy. Industry analysts estimate that the global healthcare data market

---

[1] Gabby Landsverk, *A Guide to Navigating the Wild West of the Online GLP-1 Market,* MEN'S HEALTH (July 2, 2025), https://www.menshealth.com/health/a65013285/online-glp-1-market/ (last visited Nov. 3, 2025).

[2] *About Us*, https://www.ivimhealth.com/about-us/.

exceeded $34 billion in 2022 and is projected to reach $105 billion by 2030, representing a compound annual growth rate of over 15%.[3]

7. Individual health records command premium prices in both legitimate and illicit markets, valued as much as fifty times more than credit card information due to their comprehensive nature and permanence.[4]

8. Third-party data brokers are particularly interested in this data, which they use to create detailed psychographic profiles for targeted advertisements and predictive modeling, and which can be sold and resold to advertisers, social media companies, or hackers who may use this data to orchestrate social engineering attacks.[5]

9. As a healthcare provider handling sensitive medical information, Defendant has an obligation not to disclose this data without the consent of those who provided it, and to protect the privacy and confidentiality of PII and PHI in its possession, custody or control.

---

[3] *Healthcare Analytics Market To Reach $167.0 Billion By 2030*, https://www.grandviewresearch.com/press-release/global-healthcare-analytics-market (last visited Nov. 3, 2025).

[4] Herjavec Group, *2021-2022 Healthcare Cybersecurity Report*, https://3447277.fs1.hubspotusercontent-na1.net/hubfs/3447277/2021-Healthcare-Cybersecurity-Report.pdf (last visited Nov. 3, 2025).

[5] *Id.*

10. This obligation is not merely ethical but rather, it is mandated by law; specifically, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Notwithstanding its status as a healthcare provider, Defendant voluntarily assumes the responsibility of HIPAA compliance by advertising itself as a HIPAA-compliant company.[6]

11. Despite these obligations, Defendant has systematically violated its users' privacy rights by using tracking technologies in its Website that capture and transmit PII and PHI to third parties for marketing and analytics purposes including, but not limited to, selling PII and PHI to advertisers, profiling users without their knowledge, targeting users with advertisements based on their medical conditions, as well as other improper uses of their purportedly confidential PII and PHI.

12. The unauthorized disclosure of medical information is a fundamental breach of trust in any relationship between one party seeking care and another purporting to offer it.

13. When users seek medical care through the Website, they reasonably expect that their sensitive health information–including health conditions, prescription medications, and medical histories–will remain confidential between them and their healthcare providers.

[6] *HIPAA Notice*, https://www.ivimhealth.com/hipaa-notice/

14. Instead, this information has been harvested using pixels and other tracking technologies that Ivim decided to use on its Website to disclose that information to technology companies and data brokers who use it for their own commercial purposes.

15. Plaintiff, in her individual and representative capacity, asserts claims for: (i) violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.*; (ii) violations of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, *et seq.*; (iii) Negligence; (iv) Breach of Confidence; and (v) Unjust Enrichment.

## PARTIES

16. Plaintiff Dana Olita is an adult citizen who lives, and at all relevant times has lived, in Philadelphia, Pennsylvania.

17. Defendant Ivim Services, LLC is a limited liability corporation incorporated and existing under the laws of the State of Delaware, with its principal place of business located at 336 W 1st St., Ste. 1143, in Flint, Michigan 48502.

## JURISDICTION & VENUE

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action lawsuit wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs,

there are more than 100 members in the proposed class, and at least one member of the class (*e.g.*, Plaintiff) is a citizen of a state different from Defendant.

19. This Court has personal jurisdiction over Defendant because it is headquartered in Flint, Michigan, and conducts significant operations in this District.

20. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because IVIM is a corporation with its principal place of business in Flint, Michigan and therefore resides in this judicial district for venue purposes under 28 U.S.C. § 1391(c)(2).

## FACTUAL ALLEGATIONS

### I. DATA TRACKING IN THE TELEHEALTH INDUSTRY

21. Given the popularity of GLP-1 products in the United States, the market for companies such as Ro, Hims & Hers, Calibrate, Noom, and others that offer online prescriptions and access to these medications is extremely competitive.

22. Wide-scale interest in GLP-1 products has generated considerable medical data and drawn interest from advertising companies and data brokers.

23. Telehealth companies rely heavily on digital advertising for customer acquisition and many of them use website tracking technologies to measure advertising effectiveness and to retarget prospective patients.[7]

---

[7] *See, e.g.*, Emily Baumgaertner, *Cerebral, Telehealth Startups Face Privacy Pushback over Ad Models*, STAT NEWS (Mar. 22, 2023),

24. A December 2022 investigation by journalists at *The Markup* and STAT News examined 50 direct-to-consumer telehealth companies and found that 49 had third-party tracking code with the potential to collect and to share sensitive health data with various Adtech platforms such as Facebook and Google, among many others.[8]

25. On thirteen websites, trackers from Meta, Google, TikTok, and other platforms collected patients' answers to medical intake questions about health conditions, medications, and treatment needs.[9]

26. On 25 telehealth sites—including those operated by Hims & Hers, Ro, and Thirty Madison—tracking codes informed tech platforms when users added prescription medications to shopping carts or completed treatment subscriptions.[10]

---

https://www.statnews.com/2023/03/22/cerebral-lawsuit-privacy/ (last visited Nov. 3, 2025).

[8] Todd Feathers, *et al.*, "*Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, THE MARKUP (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies (last visited Nov. 3, 2025).

[9] *See id.*

[10] *Id.*

27. Recognizing the sensitivity of the data shared on telehealth sites and the potential for misuse of this information, federal regulators have aggressively pursued telehealth companies for improper data sharing.

28. The FTC, for example, has reached significant settlements with BetterHelp ($7.8 million for sharing mental health data with Facebook, Snapchat, and Pinterest),[11] GoodRx ($1.5 million for sharing prescription data with Facebook and Google),[12] and Cerebral (affecting 3.1 million patients whose data was shared with Meta, Google, and TikTok).[13]

---

[11] *Fed. Trade Comm'n, FTC Proposed Order Prohibits BetterHelp from Revealing Consumers' Data, Including Sensitive Mental Health Information, to Facebook and Others* (Mar. 2, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-proposed-order-prohibits-betterhelp-revealing-consumers-data-including-sensitive-mental-health (last visited Nov. 3, 2025).

[12] *Fed. Trade Comm'n, FTC Enforcement Action Bars GoodRx from Sharing Consumers' Sensitive Health Info for Advertising* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bars-goodrx-sharing-consumers-sensitive-health-info-advertising (last visited Nov. 3, 2025).

[13] *Pixel Use Results in Impermissible Disclosure of the PHI 3.1 Million Cerebral Platform Users*, HIPAA JOURNAL (Mar. 13, 2023), https://www.hipaajournal.com/cerebral-impermissible-disclosure-pixel-3170000/ (last visited Nov. 3, 2025).

29. In July 2023, the FTC and HHS Office for Civil Rights jointly warned 130 hospital systems and telehealth providers about privacy risks from tracking technologies.[14]

30. Despite these enforcement actions, telehealth providers continue to use trackers on their sites (without any disclosure) to collect and to monetize as much user data as possible including, but not limited to, providing PII and PHI to third parties for advertising purposes. Simply put, these companies are exploiting the popularity of their products and the sensitivity of their customers' needs in order to profit through undisclosed third-party advertising integrations.

## II. USERS' PII AND PHI, INCLUDING MEDICAL DATA, IS SOLICITED BY AND DIVULGED TO THIRD PARTIES THROUGH THE WEBSITE.

31. Defendant owns and operates the Website as a telehealth platform that provides virtual weight loss consultations and prescription services for weight management medications.

32. Thousands of people rely on Defendant and its services, including the Website, as their primary conduit to weight loss treatment and related health services.

---

[14] *Fed. Trade Comm'n, FTC and HHS Warn Hospital Systems and Telehealth Providers About Privacy and Security Risks from Online Tracking Technologies* (July 20, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (last visited Nov. 3, 2025).

33. The Website is marketed as offering specialized weight loss programs with access to prescription medications like GLP-1 agonists for weight management solutions.

34. The Website has achieved significant market penetration in the rapidly growing telehealth weight loss market, capitalizing on demand for GLP-1 medications and other weight loss treatments.

35. Defendant markets the Website as providing confidential, personalized weight loss solutions in compliance with HIPAA.

36. Unlike traditional healthcare providers who collect patient information after establishing a provider-patient relationship, the Website requires users to submit detailed health information through a comprehensive onboarding quiz before they can create an account, review any privacy policies, or access services.

37. The Website contains numerous first- and third-party tracking implementations that measure and record user data. These tracking technologies, including web beacons, pixels, and software development kits ("SDKs"), are small pieces of code that developers integrate directly into their websites to track user behavior and transmit data to third-party platforms—in this case, transmitting sensitive health information for advertising and analytics purposes.

38. By installing and using these tracking technologies, developers—including those who created the Website or have been responsible for their maintenance

and updates—embed these companies' technologies enabling comprehensive data collection regarding users' health information, quiz responses, and personal identifiers.

## III. HOW DEFENDANT USES NORTHBEAM TRACKING TECHNOLOGY.

39. Whereas some trackers are set up to only recognize users who have an already-existing social media account with the tracker's provider, the Website includes web tracking technology developed by Northbeam, a company that provides advertising and analytics technologies to companies across the internet ecosystem.

40. The Northbeam web tracking technology, as implemented on the Website, records and transmits PHI and PII that a user enters in the quiz such as their full name, email, and phone number, along with quiz responses including weight data, medical histories, past surgeries, health conditions, and medications.

41. This means Northbeam collects all quiz responses including users' PHI and connects them to individual users' via their names, email addresses, and phone numbers.

42. Northbeam is a marketing intelligence platform that provides ecommerce and direct-to-consumer brands with attribution analytics and customer journey tracking.[15]

[15] *What is Pixel Tracking?*, https://www.northbeam.io/blog/what-is-pixel-tracking (last visited Dec. 3, 2025).

43. The Northbeam platform operates the Northbeam web tracking technology which Northbeam instructs its business customers to deploy on every page of their websites.[16]

44. Northbeam describes its SDK as "a snippet of code that allows Northbeam to collect important behavioral information about your website visitors."[17]

45. The Northbeam web tracking technology is loaded asynchronously from Northbeam's servers at "j.northbeam.io" using a unique client identifier assigned to each website operator.[18]

46. When a visitor loads a webpage containing the Northbeam web tracking technology, the JavaScript code executes in the visitor's browser and begins collecting data about the visitor's browsing behavior and interactions.

47. Northbeam instructs website operators to configure a DNS A-Record that creates a subdomain (typically "i") pointing to Northbeam's servers.[19] As Northbeam explains, "This simple step enables first-party tracking using your

---

[16] *Id.*

[17] *Add Pixel*, https://docs.northbeam.io/docs/add-pixel (last visited Dec. 3, 2025).

[18] *All Other Platforms Installation*, https://docs.northbeam.io/docs/non-shopify-installation (last visited Dec. 3, 2025).

[19] *Link DNS*, https://docs.northbeam.io/docs/link-dns (last visited Dec. 3, 2025).

domain, unlocking advanced tracking capabilities while avoiding many of the limitations of third-party tracking."[20]

48. Through this subdomain configuration, Northbeam sets first-party cookies on visitors' browsers that store user data and tracking information.[21] Northbeam states that "First-party cookies store user data, and pixel events are sent securely to your Northbeam dashboard."[22]

49. This configuration allows Northbeam to track returning visitors and link their browsing sessions across multiple visits to the website.

50. Northbeam provides website operators with JavaScript methods to identify individual visitors and link their browsing activity to PII. The *identify()* method "Identifies the current user with a particular real-world identifier" and "[b]etter enables Northbeam to understand cross-device activity."[23] This method currently works with email addresses to link a visitor's browsing behavior to their identity.[24]

---

[20] *Id.*

[21] *Northbeam's Data Sources*, https://docs.northbeam.io/docs/northbeam-data-sources (last visited Dec. 3, 2025).

[22] *Id.*

[23] *(Optional) Additional Events*, https://docs.northbeam.io/docs/optional-additional-methods (last visited Dec. 3, 2025).

[24] *Id.*

51. Northbeam also offers an *identifyCustomerId()* method that "Identifies the current user with an ID from your Order Management System (OMS)" to "help[] Northbeam track cross-device behavior more accurately."[25] This method enables Northbeam to correlate website browsing activity with customer records in the website operator's backend systems.

52. The *fireEmailCaptureEvent()* method "[s]ends an event to Northbeam indicating that a user has signed up for something with their email address."[26] Northbeam documentation states that "if you fire an email capture event, there is no need to call identify - fireEmailCaptureEvent implicitly does an identify() call in the backend."[27]

53. This means that whenever a visitor submits their email address through a form on a website using Northbeam, their email is automatically transmitted to Northbeam and linked to their browsing history.

54. Northbeam enables website operators to track custom events and goals through the *fireCustomGoal()* method, which "[s]ends an event to Northbeam

[25] *Id.*

[26] *Sign Up Events*, https://docs.northbeam.io/docs/setting-up-email-signups (last visited Dec. 3, 2025).

[27] *(Optional) Additional Events*, *supra*, n.23.

indicating that a custom goal has happened."[28] Examples of custom goals include "custom quote form fills," "SMS signups," and "add-to-cart events," allowing comprehensive tracking of visitor interactions throughout the website.

55. Northbeam's *firePurchaseEvent()* method captures detailed transaction data when a visitor completes a purchase.[29] The purchase event transmits extensive order information to Northbeam, including: the order ID, total price, shipping price, tax amount, coupon codes used, currency, and detailed line item information for each product purchased (including product ID, variant ID, product name, variant name, price, and quantity).[30]

56. Northbeam tracks visitor sessions and customer journeys through its proprietary system.

57. A "Visit" in Northbeam "typically marks the beginning of a session, which is defined as a period of continuous activity on the site" that "generally ends after 30 minutes of inactivity."[31]

---

[28] *Id.*

[29] *Add client-side purchase tracking*, https://docs.northbeam.io/docs/add-client-side-purchase-tracking (last visited Dec. 3, 2025).

[30] *Id.*

[31] *Differences in Visits and Journeys*, https://docs.northbeam.io/docs/differences-in-visits (last visited Dec. 3, 2025).

58. Northbeam's system identifies mid-session ad clicks through platform-specific click ID parameters in URLs, including gclid (Google Ads), fbclid (Meta Ads), msclkid (Microsoft Ads), ttclid (TikTok Ads), aleid (AppLovin), epik (Pinterest Ads), and ScCid (Snapchat Ads).[32]

59. Northbeam combines all these and other data through what it calls a "Device Graph" that aggregates data from multiple sources to create comprehensive profiles of individual visitors.[33]

60. Northbeam uses "world-class Machine Learning models to accurately stitch users across sessions through a bespoke identity and device graph."[34] This enables Northbeam to track individual users across different devices, browsers, and sessions, creating a unified profile of each visitor's complete browsing and purchasing history.

61. Northbeam emphasizes that its tracking system is built on first-party data collection. Northbeam states that "[t]he core of Northbeam's MTA tracking

[32] *Id.*

[33] *Northbeam Metrics 101*, https://docs.northbeam.io/docs/northbeam-metrics-101 (last visited Dec. 3, 2025).

[34] *Northbeam, Unlocking Growth With Dependable Data & Clear Customer Journeys: KITSCH*, https://www.northbeam.io/case-study/unlocking-growth-with-dependable-data-clear-customer-journeys-kitsch (last visited Dec. 3, 2025).

solution uses a first-party cookie from your website" and that it "leverage[s] only first-party data to resolve customer identities."[35]

62. This first-party data approach allows Northbeam's tracking to persist despite browser restrictions on third-party cookies and other privacy protections.

63. All data collected by Northbeam is transmitted to and stored on Northbeam's servers located in the United States. Northbeam, Inc. is a Delaware corporation headquartered at 222 North Pacific Coast Highway, Suite 2000 in El Segundo, California 90245.[36]

64. Northbeam's Privacy Policy states that "[o]ur servers are located in the United States" and that visitor "information may be transferred to, stored, and processed by us in our facilities."[37]

65. Northbeam collects and processes visitor data to provide its business customers with marketing attribution and customer journey analytics.

---

[35] *How Will Cookie Deprecation Affect Northbeam? An Explainer*, https://www.northbeam.io/blog/how-will-cookie-deprecation-affect-northbeam-an-explainer (last visited Dec. 3, 2025).

[36] *Northbeam, Privacy Policy*, https://www.northbeam.io/privacy (last visited Dec. 3, 2025).

[37] *Id.*

66. The information collected includes behavioral data such as marketing touchpoints, pages visited, session duration, and conversion events.[38]

67. This data is combined with PII—including email addresses and unique customer IDs—to create detailed profiles of individual visitors that persist across multiple browsing sessions and devices.

## IV. WEBSITE USERS' PHI AND PII IS INTERCEPTED BY TRACKING TECHNOLOGIES WITHOUT USERS' CONSENT.

68. Defendant maintains and owns the Website and has made the conscious and intentional decision to install tracking technologies within its Website, thereby allowing Northbeam, among other third-party trackers that may be present on the Website, to intercept and to collect all user interactions-including responses to sensitive health screening questions-in real-time.

69. Individuals who visit the Website are not immediately presented with the option to create an account and do not pass a link to any terms of use, privacy policy or any other page where tracking activities are disclosed.

70. Rather, upon accessing the Website, the user is presented with buttons inducing them to "Learn More" and then "Get Started," leading the user to an assessment quiz before they have an opportunity to review any terms of service or privacy policy.

---

[38] *Id.*




71. Users are directed to a survey through which they are required to answer questions on sensitive health topics and to provide PII like their names and email addresses. Examples of the questions asked in the quiz are reproduced below.

**Let's get started!**




No matter where you're at in your GLP-1 journey, Ivim Health has the doctor-led care, dosing, and discounts you deserve.

Please share your GLP-1 history:

- ○ **Never been on a GLP-1 medication**
- ○ **Previously was on a GLP-1 medication**
- ○ **Currently on a GLP-1 medication**

Required

This helps determine any applicable promotions and aids your medical provider in determining the most appropriate GLP-1 medication and dose to initiate your medical therapy.







72. Users are also asked to input their email and phone number before completing the quiz.




73. The Northbeam web tracking technology is active on every page throughout the quiz and is set up to capture the location of a user's clicks and send these to Northbeam.

74. Northbeam identifies each user through its Device Graph feature, which uses information gathered from web pages across the internet, including user's PII, to create a user's Device Graph and through this feature identify specific users across sites.

75. As configured on the Website, Northbeam's web tracking technology also captures and transmits page names, the text and format of the page, and user

clicks and interactions with the page and its contents. In the context of the quiz, where answers are provided by clicking certain elements on the page, clicks correspond to answers to sensitive questions. Through recording user clicks on these pages, Northbeam intercepts users' answers to these questions.

76. Northbeam's web tracking technology also captures and stores user identities entered on the Website through features like "EmailCaptureEvent" and "identifyCustomerId," which transmit PII to Northbeam.




*Representational screenshot of Northbeam web tracking technology which is configured and active on every quiz page on the Website*

```
function init(config, bundle) {
    clientConfig = config;
    var LegacyNorthbeamAsAnObject = {
            identify: identify_1.identify,
            identifyCustomerId: identifyCustomerId_1.identifyCustomerId,
            trackPageView: trackPageView_1.trackPageView,
            fireEmailCaptureEvent: fireEmailCaptureEvent_1.fireEmailCaptureEvent,
            fireCustomGoal: fireCustomGoal_1.fireCustomGoal,
            firePurchaseEvent: firePurchaseEvent_1.firePurchaseEvent,
            fireSlimPurchaseEvent: fireSlimPurchaseEvent_1.fireSlimPurchaseEvent
        },
        NorthbeamPublicFunctions = {
            identify: identify_1.identify,
            identifyCustomerId: identifyCustomerId_1.identifyCustomerId,
            trackPageView: trackPageView_1.trackPageView,
            fireEmailCaptureEvent: fireEmailCaptureEvent_1.fireEmailCaptureEvent,
            fireCustomGoal: fireCustomGoal_1.fireCustomGoal,
            firePurchaseEvent: firePurchaseEvent_1.firePurchaseEvent,
            fireSlimPurchaseEvent: fireSlimPurchaseEvent_1.fireSlimPurchaseEvent
        },
```

*Events set up in the Northbeam web tracking technology including the "identifyCustomerID" and "EmailCaptureEvent"*

```
            },
            addClickListeners: function() {
                var e,
                    n,
                    r = document.links;
                for (e = 0; e < r.length; e++)
                    o(r[e]) && !r[e][t] && (n = r[e], i ? (a.addEventListener(n, "mouseup", p(s), !1), a.addEventListener(n,
"mousedown", p(s), !1)) : a.addEventListener(n, "click", p(s), !1), r[e][t] = !0)
            }
        }
    }
}, {
    "./lib/helpers": 292,
    "lodash/isUndefined": 268
}],
```

*Example of click tracking events set up within the Northbeam web tracking technology*

77. As the screenshots above show, these pixels capture the sensitive health information and unique identifiers that users provide through the quiz process and transmit this data to Northbeam.

78. Therefore, individuals who take the quiz are tracked and uniquely identified through Northbeam's capture of their identifying characteristics like full name and email address, as well as through Northbeam's method of identifying users through their "Device Graph" profiling.

79. At no point in the quiz process is the user presented with any disclosure, either explicit or constructive, that the Northbeam web tracking technology is present on every page of the quiz to capture answers to these highly sensitive questions, or that Northbeam collects user data from across the web to create personalized, identifiable profiles combining the sensitive data entered on the Website with users' broader web browsing activity.

## V. REPRESENTATIVE PLAINTIFF'S EXPERIENCE.

80. Plaintiff Dana Olita currently resides (and all times herein relevant has resided) in Philadelphia, Pennsylvania.

81. On or about February 2024, while living and physically present in Pennsylvania, Plaintiff Olita accessed the Website to search for GLP-1 treatment options.

82. During this visit, Plaintiff Olita completed the initial quiz process, which required her to input answers to sensitive questions, including but not limited to those seen in the screenshots *supra.*

83. At no point before or during this process was Plaintiff Olita provided with any notice or means to consent (*i.e.*, a link to Defendant's terms of use or privacy policy) to her answers being recorded. Nor was she provided with any notice that this recording was taking place.

84. Plaintiff Olita did not click on, view, or otherwise access any hyperlinks to Defendant's terms of use, privacy policy, or any similar page during the visit.

85. Plaintiff Olita had not checked any box, clicked any button, or taken any other affirmative action indicating consent to have her data captured by the Northbeam web tracking technology present on every page of the quiz, or to have her communications intercepted by Northbeam or any other third party when she took the quiz.

86. Plaintiff Olita was unaware at the time that her sensitive information including PHI was being captured in real time by the Northbeam web tracking technology present on every page of the quiz and disclosed to Northbeam, which collects user data from across the web to create personalized, identifiable profiles combining PHI and PII entered on the Website with users' web browsing activity.

87. Had she known that Defendant was using the Northbeam web tracking technology on every page of the quiz to capture her answers to sensitive health questions, and that Northbeam collects user data from across the web to create personalized, identifiable profiles combining the sensitive data entered on the Website

with her web browsing activity, Plaintiff Olita would not have used the Website or would have limited the information provided.

88. As a result of Defendant's conduct, Plaintiff's privacy rights were violated, and Plaintiff suffered harm in the form of loss of control over her private and sensitive health data, increased anxiety due to unknown parties accessing sensitive data, loss of the benefit of the bargain in keeping or exchanging her private and sensitive health data, and other harms related to the undisclosed and non-consenting transmission of PII and PHI.

## CLASS ACTION ALLEGATIONS

89. Plaintiff, on behalf of herself and all others similarly situated, seeks relief under Federal Rule of Civil Procedure 23 on behalf of the following class and subclass (collectively, the "Classes"):

**The Nationwide Class:**

> All individuals who used the Website and had their electronic communications containing personal health information intercepted and transmitted to third parties without their knowledge or consent.

**The Pennsylvania Subclass:**

> All individuals who, while residing in Pennsylvania, used the Website and had their electronic communications containing personal health information intercepted and transmitted to third parties without their knowledge or consent.

90. The following people are excluded from the Class and Subclass: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class or Subclass; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

91. Plaintiff reserves the right to revise or amend the Class definitions based on the discovery of new information.

92. **Numerosity:** The exact number of members of the Class is unknown but, upon information and good faith belief, it is estimated to number in the hundreds of thousands, and individual joinder of these claims is therefore wholly impracticable. Members of the Class can be readily identified through Defendant's records and objective criteria and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

93. **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff and the members of the Class sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements,

concealment, and unlawful practices, and Plaintiff and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

94. **<u>Adequacy</u>:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with or are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

95. **<u>Commonality and Predominance</u>:** There are many questions of law and fact common to the claims of Plaintiff and the Classes and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to the following:

a. Whether Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*.;

b. Whether Defendant violated the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701, *et seq*.;

c. Whether Defendant's use of the Northbeam web tracking technology is an unauthorized interception of electronic communications;

d. Whether Defendant unlawfully intercepted and manipulated user communications;

e. Whether Defendant was unjustly enriched by collecting and monetizing class members' PHI;

f. Whether Defendant's practices violated healthcare privacy laws and regulations

g. Whether Defendant was unjustly enriched by intercepting class members' communications;

h. Whether Defendant's representations on the Website were deceptive;

i. Whether Plaintiff and Class Members are entitled to damages and injunctive relief.

96. **Superiority:** There are substantial benefits to proceeding as a class action that render proceeding as a class action superior to any alternatives, including that class-wide adjudication will provide a realistic means for members of the Class to receive monetary relief; the monetary relief suffered by members of the Class may be relatively small; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have equitable recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiff and her counsel know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

97. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include:

a. Whether Defendant obtained proper consent before recording users' interactions with the Website or recording users' information through the Website;

b. Whether Defendant's actions violated Website visitors' reasonable expectations of privacy; and

c. Whether Defendant's collection of its users' personal and medical information through third-party tracking technology constitutes an invasion of privacy.

98. Finally, all members of the proposed Class are readily ascertainable as Defendant has access to Class Members' names, emails and physical addresses.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C §2510, *et seq.*
### *(On Behalf of Plaintiff & the Nationwide Class)*

99. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

100. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

101. The ECPA protects both the sending and receipt of communications.

102. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

103. A violation of the ECPA occurs where any person:

> intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic

> communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication.

18 U.S.C. §§ 2511(1)(a), (c)-(d).

104. ECPA also holds that:

> [A] person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication [ ] while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient.

18 U.S.C. § 2511(3)(a).

105. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

106. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

107. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

108. Whenever Plaintiff and Class members interacted with the Website and completed health screening questionnaires, Defendant, through the Northbeam web tracking technology it embedded in the Website, contemporaneously and intentionally intercepted the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, and redirected such contents to Northbeam, a third party other than an addressee or intended recipient of such communication.

109. Whenever Plaintiff and Class members interacted with the Website, Defendant, through the Northbeam tracking technologies it embedded and ran on the Website, contemporaneously and intentionally divulged the contents of Plaintiff's and Class members' electronic communications while those communications were in transmission, to Northbeam, a third party other than an addressee or intended recipient of such communication.

110. Defendant intentionally intercepted and used the contents of Plaintiff's and Class members' electronic communications for unauthorized purposes including disclosing and, on information and belief, profiting from, Plaintiff's and Class members' health-related communications by transmitting the contents to Northbeam for marketing analytics and behavioral targeting purposes.

111. Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of sharing the sensitive health information contained therein with third parties such as Northbeam.

112. Defendant's interception and disclosure of Plaintiff's and Class members' electronic communications containing PHI violates HIPAA's criminal provisions, specifically 42 U.S.C. § 1320d-6, which makes it a crime to knowingly and in violation of HIPAA obtain or disclose individually identifiable health information.

113. Defendant intercepted Plaintiff's and Class members' electronic communications for purposes other than providing healthcare services to Plaintiff and Class members without authorization or consent and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

114. Defendant's interception of Plaintiff's and Class members' electronic communications was undertaken in furtherance of and to facilitate the commission of the crime of unlawful disclosure of PHI under 42 U.S.C. § 1320d-6.

115. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiff and Class members were damaged by Defendant's conduct in that:

a. Defendant harmed Plaintiff's and Class members' interest in privacy;

b. Sensitive and confidential health information that Plaintiff and Class members intended to remain private between them and their healthcare provider is no more;

c. Defendant eroded the essential confidential nature of its relationship to Website users;

d. Defendant took something of value from Plaintiff and Class members and derived benefit therefrom without Plaintiff's and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

e. Plaintiff and Class members did not get the full value of the healthcare services for which they paid or sought, which included Defendant's duty to maintain confidentiality; and

f. Defendant's actions diminished the value of Plaintiff's and Class members' personal health information.

116. Plaintiff, individually and on behalf of the Class members, seeks all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT ("PWESCA")
### 18 Pa. Cons. Stat. § 5701, *et seq.*
### (*On Behalf of Plaintiff & the Pennsylvania Subclass*)

117. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

118. Plaintiff brings this Count individually and on behalf of the members of the Pennsylvania Subclass.

119. The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication;

(2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

120. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

121. At all relevant times, Plaintiff was physically located in Pennsylvania when accessing and using the Website to seek virtual healthcare services.

122. Plaintiff's communications with the Website, including responses to medical screening questions, input of health information, and interactions with the Website's interface, constitute "electronic communications" within the meaning of the PWESCA.

123. Through the numerous first- and third-party software implementations embedded on the Website—including tracking technologies, cookies, web beacons,

SDKs, pixels, and advertising networks, from Northbeam and likely other third parties—Defendant intentionally intercepted Plaintiff's electronic communications in real-time as they were transmitted.

124. These tracking technologies constitute devices capable of intercepting electronic communications within the meaning of the PWESCA, as they are specifically designed to capture, record, and transmit user interactions and data inputs as they occur.

125. Defendant's interception of Plaintiff's and Pennsylvania Subclass members' electronic communications was accomplished without their consent.

126. Specifically:

a. Defendant never obtained express consent from Plaintiff or Pennsylvania Subclass members before implementing third-party tracking technologies from Northbeam and likely other third parties;

b. The Website requires users to submit medical information through preliminary screening questions before they can create an account or review any privacy policies;

c. Tracking and interception begin immediately upon accessing the Website, before any opportunity for users to provide informed consent;

d. Defendant never provided clear, conspicuous notice that users' electronic communications containing medical information would be intercepted and shared with unauthorized third parties such as Northbeam;

e. Any purported consent was ineffective because the interception began before consent could be obtained and because the disclosures were inadequate under Pennsylvania law.

127. The intercepted communications include highly sensitive medical information that Plaintiff and Pennsylvania Subclass members provided with reasonable expectations of privacy and confidentiality, including:

a. Responses to health screening questions;

b. Medical history and current health conditions;

c. Prescription medication information;

d. Health insurance details; and

e. Other PHI.

128. Defendant's conduct was willful and intentional, as Defendant deliberately implemented tracking technologies knowing they would intercept users' electronic communications without proper consent.

129. As a direct and proximate result of Defendant's violations of the PWESCA, Plaintiff and Pennsylvania Subclass members have suffered injury, including invasion of privacy, loss of confidentiality of medical information, and violation of their statutory rights.

130. Plaintiff continues to desire to use virtual healthcare services but has a reasonable fear that her electronic communications will continue to be intercepted without consent if she is using the Website.

131. Under 18 Pa. C.S. § 5725, Plaintiff and Pennsylvania Subclass members are entitled to:

a. Actual damages, but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1,000, whichever is greater;

b. Punitive damages;

c. Reasonable attorneys' fees and other litigation costs reasonably incurred; and

d. Such preliminary and other equitable or declaratory relief as may be appropriate.

132. Unless enjoined by this Court, Defendant will continue to intercept the electronic communications of Pennsylvania residents without their consent, causing irreparable harm for which there is no adequate remedy at law.

## THIRD CAUSE OF ACTION

### NEGLIGENCE
### (*On Behalf of Plaintiff & the Nationwide Class*)

133. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

134. Upon accepting, storing and controlling the PII and PHI of Plaintiff and the Class, Defendant owed—and continues to owe—a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive PII and PHI.

135. Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI from unauthorized disclosure.

136. It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII and PHI through its use of third-party tracking technologies would result in unauthorized third parties gaining unlawful access to such PII and PHI.

137. Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' PII and PHI arose due to the special relationship that existed between Defendant and its patients, which is recognized by statute, regulations and the common law.

138. In addition, Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

139. Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their PII and PHI. Defendant's misconduct included the failure to (1) secure Plaintiff's and Class Members' PII and PHI; (2) comply with industry-standard data security practices; (3) implement adequate Website and event

monitoring; and (4) implement the systems, policies and procedures necessary to prevent unauthorized disclosures resulting from the use of the tracking technologies.

140. As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' PII and PHI, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

141. Defendant's wrongful actions and inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' PII and PHI constituted (and continues to constitute) negligence at common law.

142. Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### BREACH OF CONFIDENCE
***(On Behalf of Plaintiff & the Nationwide Class)***

143. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

144. Possessors of non-public medical information, such as Defendant, have a duty to keep such medical information completely confidential.

145. Plaintiff and Class Members had reasonable expectations of privacy in the responses and communications entrusted to Defendant through the Website, which included highly sensitive PII and PHI.

146. Contrary to its duties as a telehealth institution and its promises of confidentiality, including but not limited to its HIPAA notice, Defendant installed third-party tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' PII and PHI, including sensitive and private data relating to Plaintiff's and Class Members' health.

147. These disclosures were made without Plaintiff's or Class Members' knowledge, consent or authorization.

148. The third-party recipients included, but may not be limited to, Northbeam.

149. As a direct and proximate cause of Defendant's unauthorized disclosures of Plaintiff's and Class Members' PII and PHI, Plaintiff and Class Members were damaged by Defendant's breach of confidentiality in that:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of health services that Plaintiff and Class Members participated in;

d. General damages for invasion of their rights in an amount to be determined by a jury at trial;

e. Nominal damages for each independent violation;

f. The unauthorized use of something of value (the highly sensitive PII and PHI) that belonged to Plaintiff and Class Members and the obtaining of a benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation to Plaintiff or Class Members for the unauthorized use of such data;

g. Diminishment of the value of Plaintiff's and Class Members' PII and PHI; and

h. Violation of property rights Plaintiff and Class Members have in their PII and PHI.

## FIFTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (*On Behalf of Plaintiff & the Nationwide Class*)

150. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

151. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

152. Defendant has been unjustly enriched at the expense of Plaintiff and Class members through its unauthorized collection, use, and monetization of their PHI and other personal data.

153. Plaintiff and Class members conferred a benefit upon Defendant by providing valuable PHI, including sensitive health data, medical histories, and personal identifiers, through their use of the Website.

154. Individual health records command premium prices in data markets, valued as much as 50 times more than credit card information due to their comprehensive nature and permanence.

155. Health information commands exceptional value due to its predictive power and marketing utility.

156. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Class members' PHI to Northbeam through embedded SDK technology without authorization or consent.

157. Defendant has been unjustly enriched through several mechanisms:

a. Data Monetization: Defendant derives commercial value from sharing users' PHI with third parties like Northbeam for marketing analytics, behavioral targeting, and user profiling purposes;

b. Cost Avoidance: Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable health data;

c. Competitive Advantage: Defendant gained unfair competitive advantages by leveraging detailed health data profiles to optimize its platform and marketing without bearing the costs associated with compliant data collection.

d. Enhanced Platform Value: The unauthorized collection of comprehensive user health data increases the overall value and effectiveness of Defendant's telehealth platform.

158. Defendant obtained this benefit through unlawful interception and unauthorized disclosure of PHI in violation of HIPAA, the ECPA, and the PWESCA.

159. Whereas Plaintiff and Class members provided this valuable information in the context of seeking confidential healthcare services with a reasonable expectation of privacy and HIPAA compliance, Defendant actively concealed its data collection and sharing practices from users who were unaware their health information was being intercepted and monetized despite marketing itself as a "HIPAA-compliant" healthcare service.

160. Defendant's retention of these benefits violates fundamental principles of fairness and equity, as Defendant has profited from the unauthorized exploitation of some of the most sensitive and valuable personal information—PHI—without providing any compensation or benefit to the individuals whose privacy was violated.

161. Plaintiff and Class members have no adequate remedy at law for Defendant's unjust enrichment, as they cannot recover the specific value of their appropriated health data through traditional damages calculations.

162. As a direct and proximate result of Defendant's Unjust Enrichment, Plaintiff and Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their PHI.

163. Plaintiff and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct,

together with interest thereon, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Dana Olita, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant Ivim Services, LLC and in favor of Plaintiff and the Classes, and grant the following relief:

A. Certify this case as a class action on behalf of the Classes defined above, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

B. Enter a judgment finding that Defendant's actions, as described herein, violate HIPAA, the ECPA, the PWESCA, and constitute common law negligence and breach of confidence;

C. Award injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Classes including:

   i. An order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii. An order requiring Defendant to implement proper notice and consent mechanisms before using tracking technology;

   iii. An order requiring Defendant to destroy all data collected through unlawful monitoring practices;

D. Award statutory damages to Plaintiff and the Classes under the ECPA, 18 U.S.C. § 2520(c)(2), in the amount of the greater of $100 per day for each day of violation or $10,000

per violation, or actual damages and any profits made by Defendant, whichever is greater;

E. Award statutory damages to Plaintiff and the Pennsylvania subclass under the PWESCA, 18 Pa. Cons. Stat. § 5701, *et seq*. in the amount of $1,000 or actual damages, whichever is greater.

F. Award restitution and disgorgement of Defendant's Unjust Enrichment, including all revenue derived from their unlawful business practices;

G. Award Plaintiff and the Classes reasonable litigation expenses and attorneys' fees;

H. Award Plaintiff and the Classes pre- and post-judgment interest to the extent allowable; and

I. Award such other and further relief as equity and justice may require.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury for all issues so triable.

Dated: December 12, 2025

Respectfully submitted,

*/s/ Gregory A. Mitchell*
Gregory A. Mitchell (P68723)
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
gam@millerlawpc.com
epm@millerlawpc.com

David S. Almeida
**ALMEIDA LAW GROUP LLC**

849 W. Webster Avenue
Chicago, Illinois 60614
Tel.: (708) 437-6476
david@almeidalawgroup.com

*Attorneys for Plaintiff & the Classes*